UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ABIGAIL STRUBEL, individually and on behalf of all others similarly situated,<br><div align="right">Plaintiff,</div><br>- against -<br><br>CAPITAL ONE<br>BANK (USA), N.A.,<br><div align="right">Defendant.</div> | No. 14-CV-5998 (AJN) |

**Plaintiff's Memorandum of Law in Support of**
**Motion for Partial Summary Judgment**

Brian L. Bromberg
Jonathan R. Miller
Bromberg Law Office, P.C.
26 Broadway, 21st Floor
New York, NY 10004
Tel: (212) 248-7906

Harley J. Schnall
Law Office of Harley J. Schnall
711 West End Avenue
New York, NY  10025
Tel: (212) 678-6546

**Attorneys for Plaintiff**

# Table of Contents

I. Introduction ................................................................................................... 1

II. Background .................................................................................................. 3

    A.  Statutory Context: The Truth in Lending Act ................................... 3

    B.  Regulatory Context: Regulation Z ...................................................... 5

    C.  Factual Background ............................................................................... 8

III. Argument .................................................................................................. 11

    A.  Summary Judgment Standard .......................................................... 11

    B.  The Bank's Disclosure Violated Regulation Z and TILA because it does not meet the clear and conspicuous standard ............................................................. 12

    C.  The Bank's font was smaller than the CFPB's minimum size ........................ 13

    D.  The Bank's other formatting choices, taken together, degraded the readability of the disclosures below the CFPB's standards. .................................. 16

    E.  Violation of the Regulation amounts to violation of the statute .................... 17

IV. Conclusion ................................................................................................ 17

# Table of Authorities

Page(s)

**Cases**

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ........................................... 12

Celotex Corp. v. Catrett,
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ........................................... 12

Chase Bank USA, N.A. v. McCoy,
562 U.S. 195 (2011) ...................................................................................................... 3

Lotes Co., Ltd. v. Hon Hai Precision Industry Co., Ltd.,
753 F.3d 395,411 (2d Cir. 2014) ............................................................................... 13

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ........................................... 12

N.Y. State Rest. Ass'n v. N.Y. City Bd. Of Health,
556 F.3d 114 (2d Cir. 2009) ....................................................................................... 15

Puello v. Bureau of Citizenship & Immigration Servs.,
511 F.3d 324 (2d Cir. 2007) ....................................................................................... 13

Schaar v. Lehigh Valley Health Servs.,
598 F.3d 156 (3d Cir. 2010) ....................................................................................... 13

Troll Co. v. Uneeda Doll Co.,
483 F.3d 150 (2d Cir.2007) ......................................................................................... 16

**Statutes**

Truth in Lending Act (TILA), 15 U.S.C. § 1601, et seq. ...................................... passim

**Other Authorities**

12 C.F.R. pt. 1026, et seq. ........................................................................................ passim

Fed. R. Civ. P. 56 ........................................................................................................ 12

# I. Introduction

This case, brought under the federal Truth in Lending Act ("TILA"),[1] arises from a credit card solicitation sent to thousands of consumers by Defendant Capital One Bank (USA), N.A. ("Capital One" or the "Bank"). Specifically, this case deals with the "Schumer Box" disclosures – disclosures that contain important information on credit card rates and fees – that accompanied Capital One's solicitation for its VentureOne credit card.

There is no genuine issue of material fact in this case. Neither party disputes that Capital One mailed the VentureOne solicitation to Plaintiff Abigail Strubel, or that Exhibit A to Strubel's Complaint fairly represents that VentureOne solicitation. Thus, the only question here – with the exception of class certification issues – is whether the disclosure Capital One included in its solicitation complied with TILA and its implementing regulation, Regulation Z.[2]

When considering the merits of this case, it is important to actually look at the VentureOne solicitation and to keep a copy handy.[3] And the first thing one notices when looking at it is: *it hurts*. Even for a person with average (or corrected) vision, reading the disclosure causes extreme discomfort. Reading Capital One's disclosure is so uncomfortable that the average person who starts reading would immediately feel a desperate urge to stop. Is it possible that TILA – a consumer-

---

[1] 15 U.S.C. § 1601, *et seq.*
[2] 12 C.F.R. pt. 1026, *et seq.*
[3] *See* **Exhibit A** to accompanying Declaration of Attorney Brian L. Bromberg ("Bromberg Decl.").

protection statute that is designed entirely around the idea of *disclosure* – allows creditors to subvert its purposes by using headache-inducing printing techniques that actually *discourage* consumers from reading the very information to which the law entitles them?

The answer, quite clearly, is no. Under the Consumer Financial Protection Bureau's ("CFPB") Official Interpretations of Regulation Z, Capital One was required to print the disclosure in a 10-point font. It did not do this. Regulation Z also required Capital One to print the disclosure in a format substantially similar to the format used by the CFPB when it designed its model disclosures. Again, Capital One did not do so here. Finally, the CFPB's Official Interpretations of Regulation Z make clear that Capital One ought to have ensured that its disclosure was readable – which Capital One certainly did not do here. The testimony of Plaintiff's expert witness – one of the world's foremost experts in typography – explains exactly how Capital One violated TILA and Regulation Z and, in the process, also sheds light on what causes that painful sensation when one tries to read the disclosure.

Capital One's disclosure violates TILA, but it does worse than that: It subverts TILA by displaying important, legally mandated information in a format that actually discourages consumers from reading it. For this reason, Plaintiff respectfully asks the Court to grant her Motion for Summary Judgment.

## II. Background

### A.        Statutory Context: The Truth in Lending Act

TILA promotes consumers' "informed use of credit" by requiring that creditors provide "meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit . . . ."[4] TILA authorizes the Consumer Financial Protection Bureau ("CFPB") to issue regulations to achieve TILA's purpose of promoting meaningful disclosure.[5] CFPB has the authority to promulgate regulations that "may contain such additional requirements, classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for all or any class of transactions, as in the judgment of the Bureau are necessary or proper."[6] The regulation promulgated to enforce TILA is known as Regulation Z.[7]

One way TILA furthers its purpose is by requiring credit issuers, when mailing solicitations to potential consumers, to disclose an array of key credit terms.[8] The required terms consist of what is commonly known as the "Schumer

---

[4] *See* 15 U.S.C. § 1601(a). *See also Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 198 (2011).
[5] *See* 15 U.S.C. § 1604(a).
[6] *Id.*
[7] *See* 12 C.F.R. § 1026.1.
[8] 15 U.S.C. § 1637(c)(1)(A).

Box" – a summary of key information, rates and fees set in a tabular format – and, in this instance, immediately below the Schumer Box, the following lines of text:

> **How Do You Calculate My Balance?** We use a method called "average daily balance (including new purchases)." See enclosed Additional Disclosures for details.
> **Can I Lose My Introductory APR?** We may end your introductory APR and apply the Penalty APR if you make a late payment.

The disclosures must be made "clearly and conspicuously" and in a tabular format.[9] TILA also granted the agency regulating the consumer credit card industry – formerly the Federal Reserve Board, but now the CFPB – the specific authority to impose additional disclosure requirements in connection with such solicitations "if [it] determines that such action is necessary to carry out the purposes of, or prevent evasions of, any [part of the statute governing credit applications and solicitations]."[10] Further, the statute also specifically authorized the agency to prescribe "the form and manner" of the disclosure of key credit terms specified within 15 U.S.C § 1637(c) to carry out the purpose of, or prevent evasions of, meaningful disclosure.

TILA provides consumers with a cause of action for statutory damages when the issuer has violated certain statutory provisions,[11] including § 1637(c). As a

---

[9] 15 U.S.C. §§ 1637(c)(4), 1632(c).
[10] 15 U.S.C. § 1637(c)(5).
[11] A consumer who receives nonconforming § 1637(c) disclosures has standing to sue for statutory damages and other specified relief so long as she either "pays a fee [for the credit card] . . . or uses the credit card[]." 15 U.S.C. §1640(a).

result, consumers may generally obtain statutory damages for a creditor's failure to provide an adequate set of application and solicitation disclosures.[12]

## B. Regulatory Context: Regulation Z

The CFPB, under the authority granted by Congress, has clarified TILA's requirements in Regulation Z. Among other things, Regulation fleshes out TILA's "clear and conspicuous" standard, requiring that disclosures be both "reasonably understandable" and "readily noticeable to the consumer."[13] And the disclosure that accompanies credit card solicitations must be "substantially similar" to Regulation Z's "Applications and Solicitations" Model Form (Credit Cards) G-10(A) or the corresponding Samples, G-10(B) and G-(10)C.[14] Crucially, the "substantially similar" requirement extends to three aspects of the disclosure: its headings, its content, and its format.[15]

The CFPB further specifies that for key account disclosures, generally a minimum 10-point font must be used in order to meet the "readily noticeable" standard.[16] More specifically, with respect to the key disclosures mandated in connection with credit applications and solicitations under 15 U.S.C. § 1637(c) and 12 C.F.R. § 1026.60, the CFPB further directs the text to be in 10-point Arial font, except for the annual percentage rate applicable to an account's Purchases feature,

---

[12] *See Id.*

[13] 12 C.F.R. § 1026 Supp. I, Comment 5(a)(1)-1.

[14] 12 C.F.R. § 1026.60(a)(2), *available online at* http://www.consumerfinance.gov/eregulations/1026-G/2013-30108_20150718#1026-G-10A.

[15] *See Id.*

[16] 12 C.F.R. § 1026 Supp. I, Comment 5(a)(1)-3.

which must be in 16-point.[17] Here is how the CFPB explains how it went about creating "Applications and Solicitations Samples" for credit cards, Forms G-10(B) and G-10(C), to make them readable and in compliance with the CFPB's general point-size requirements:

> v. Although creditors are not required to use a certain paper size in disclosing the §§1026.60 or 1026.6(b)(1) and (2) disclosures, samples G-10(B), G-10(C), G-17(B), G-17(C) and G-17(D) are designed to be printed on an 8 ½ ×14 inch sheet of paper. A creditor may use a smaller sheet of paper, such as 8 ½ ×11 inch sheet of paper. If the table is not provided on a single side of a sheet of paper, the creditor must include a reference or references, such as "SEE BACK OF PAGE for more important information about your account." at the bottom of each page indicating that the table continues onto an additional page or pages. A creditor that splits the table onto two or more pages must disclose the table on consecutive pages and may not include any intervening information between portions of the table. In addition, the following formatting techniques were used in presenting the information in the sample tables to ensure that the information is readable:
>
> > A. A readable font style and font size (10-point Arial font style, except for the purchase annual percentage rate which is shown in 16-point type).
> >
> > B. Sufficient spacing between lines of the text.
> >
> > C. Adequate spacing between paragraphs when several pieces of information were included in the same row of the table, as appropriate. For example, in the samples in the row of the tables with the heading "APR for Balance Transfers," the forms disclose two components: The applicable balance transfer rate and a cross

---

[17] 12 C.F.R. § 1026 Supp. I, Official Staff Commentary to Appendix G, Comments 5(v)(A) and 5(vi).

reference to the balance transfer fee. The samples show these two components on separate lines with adequate space between each component. On the other hand, in the samples, in the disclosure of the late payment fee, the forms disclose two components: The late payment fee, and the cross reference to the penalty rate. Because the disclosure of both these components is short, these components are disclosed on the same line in the tables.

D. Standard spacing between words and characters. In other words, the text was not compressed to appear smaller than 10-point type.

E. Sufficient white space around the text of the information in each row, by providing sufficient margins above, below and to the sides of the text.

F. Sufficient contrast between the text and the background. Generally, black text was used on white paper.

vi. *While the Bureau is not requiring issuers to use the above formatting techniques in presenting information in the table (except for the 10-point and 16-point font requirement), the Bureau encourages issuers to consider these techniques when deciding how to disclose information in the table, to ensure that the information is presented in a readable format.*

vii. Creditors are allowed to use color, shading and similar graphic techniques with respect to the table, so long as the table remains substantially similar to the model and sample forms in appendix G.[18]

---

[18] 12 C.F.R. § 1026 Supp. I, Official Staff Commentary to Appendix G, Comments 5(v) - 5(vii) (emphasis added).

## C.  Factual Background

The following factual allegations, which are not in dispute, are drawn from the accompanying affidavits, documents, discovery responses, and deposition testimony. In August 2013, Defendant – who is a "creditor" subject to TILA's requirements[19] – mailed Strubel a solicitation and a credit application for its VentureOne consumer credit card product.[20] This mailing included a two-sheet document with an application form; this document referenced another document in the mailing containing supplemental information and terms and conditions of the account.[21] The front side of the first sheet contained a form letter from "Michael Robertson, Director of Venture Rewards." On the reverse side of the first sheet, the following information was furnished:

> (1) a table of summary information, in two parts, subtitled "Interest Rates and Interest Charges" and "Fees," respectively [*i.e.,* the Schumer Box];
>
> (2) one line describing how the Bank calculates the account balance for the purpose of assessing interest charges;
>
> (3) one line describing the circumstances under which the customer could lose the benefit of the low introductory interest rate; and

---

[19] *See* Complaint, ECF#1, at ¶ 10; Answer, ECF#12, at ¶ 10. *See also See* 12 C.F.R. § 1026.2(a)(17).
[20] *See* accompanying Declaration of Plaintiff Abigail Strubel ("Strubel Decl.") at ¶ 5.
[21] *See Id. See also* **Exhibit A** to Bromberg Decl.

> (4) approximately 28 additional lines of additional
> information, mostly following a question-and-answer
> format.[22]

After receiving the solicitation, Strubel completed the application and mailed it to the Bank for approval.[23] Later, Defendant approved Strubel's application and mailed her a VentureOne card.[24] Plaintiff then used the card and made a purchase for household use.[25] Thus, Plaintiff is a consumer protected by TILA and Regulation Z.[26]

Plaintiff filed this case in July 2014.[27] Her Complaint alleged, on behalf of herself as well as the thousands of other consumers who received the VentureOne solicitation, that the Bank failed to provide disclosures that complied with Regulation Z and TILA.[28] Because the disclosures were in a font that was so much physically smaller than Arial, Plaintiff alleged that Defendants had used a font size that was smaller – or appeared to be smaller – than 10-point for the text in the Schumer Box and in the mandatory two lines directly underneath (and smaller than 16-point for the Purchases APR).[29]

During discovery, Plaintiff learned that, in fact, Capital One attempted an end-run around the point-size requirements. It did so by using a condensed "display

---

[22] *See Id.*
[23] *See* Strubel Decl. at ¶ 6.
[24] *See Id.* at ¶ 7.
[25] *See Id.* at ¶ 8.
[26] *See* 12 C.F.R. § 1026.2(a)(11).
[27] *See* Complaint, ECF#1.
[28] *See Id.*
[29] *See Id.* at ¶ 39.

font" that, while nominally 10-point, was actually substantially smaller than 10-point Arial, both horizontally and vertically.[30] In other words, instead of using a font that takes up the same physical space as Arial 10-point (and Arial 16-point for the Purchases APR), Capital One chose to use ITC Garamond Condensed Light, which is a much smaller, condensed font, even at the same nominal point-size.[31] Further, Defendant or its agent squeezed out much of the white space between the lines of text and between the individual letters to make the 1637(c) mandatory disclosures fit on approximately one-half of a single sheet of paper.[32]

As Plaintiff's expert testified at his deposition, the Bank made a number of printing and typography choices that flouted the CFPB's requirement that it print the disclosure in a readable format. First, contrary to CFPB guidance, the Bank did not use standard spacing between words and characters, causing characters not

---

[30] *See* accompanying Declaration of Thomas Phinney ("Phinney Decl.") at ¶s 27-28, 37-43 & Exhibits B and C; Deposition of Jonathan Gabriel Smith, attached as Exhibit B to Bromberg Decl. ("Smith Depo") at 50-54, 57-61, 65-66; Deposition of Thomas Phinney, attached as Exhibit C to Bromberg Decl. ("Phinney Depo", at 60-65, 94-96.

[31] *See* Smith Depo 50-54, 57-61; Phinney Decl. at ¶ 25, 27-28, 35-43 & Exhibits B and C; Phinney Depo at 60-65, 94-96.

[32] *See* Exhibit A to Bromberg Decl. Only the Schumer Box and the first two lines of text underneath the Box are required to be disclosed in an application and solicitation under § 1637(c). The next 28 lines of text printed on that page (from the line "What Are My Billing Rights?" to the bottom) contain information that is extraneous under § 1637(c). Notably, at the bottom of the page Defendant referred to supplemental information about the account, located in an enclosed document entitled "Additional Disclosures and Terms & Conditions." Nonetheless, rather than place the 28 lines of information within that supplement, Defendant chose to cross the bounds of readability and shrink the mandatory disclosures so that it could combine them with 28 extraneous lines on to one 8½-by-11-inch page.

only to appear smaller than 10-point type, but to actually overlap.[33] Second, the Bank did not use standard spacing between lines of text.[34] Third, the Bank chose to use an 8½-by-11-inch format rather than the CFPB-recommended 8½-by-14-inch format, and then crammed 28 additional lines of extraneous information with the mandatory disclosures onto that smaller piece of paper.[35] Finally, and most significantly, when the Bank printed the mandatory disclosures, it employed a condensed typeface that was approximately 12% smaller than 10-point Arial in height and width.[36]

Plaintiff has not yet moved for class certification, but plans to do so after the resolution of this Motion for Summary Judgment.[37]

## III. Argument

### A. Summary Judgment Standard

Summary judgment is appropriate when "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the

---

[33] *See* Smith Depo at 69-77; Phinney Decl. at ¶s 44-45; Phinney Depo at 51-60; Arditi Depo at 142-43.

[34] *See* Smith Depo at 69-77; Phinney Decl. at ¶s 50-54 & Exhibits B and C; Phinney Depo at 55.

[35] *See* 12 C.F.R. § 1026 Supp. I, Official Commentary to Appendix G, Comment 5; Exhibit A to Bromberg Decl.

[36] *See* Smith Depo at 69-77; Phinney Decl. at ¶s 37-43 & Exhibits B and C; Phinney Depo at 82-89; Arditi Depo at 114, 115.

[37] Ordinarily, Plaintiff would not be moving for summary judgment until after certification of a class and giving of notice. But here, Capital One has agreed to waive the "one-way intervention doctrine" so as to allow the parties to litigate liability first.

motion only), admissions, interrogatory answers, or other materials"[38] "show[] that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."[39] A genuine issue of fact exists when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome if the substantive law renders them so.[40] The movant bears the burden of demonstrating that no genuine issue exists as to any material fact.[41] The Court must draw all ambiguities and inferences in favor of the non-moving party.[42]  But to defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."[43] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[44]

### B. The Bank's Disclosure Violated Regulation Z and TILA because it does not meet the clear and conspicuous standard

In comparing the Bank's application and solicitation disclosures to the examples provided by the CFPB, even the casual observer could readily see that the format of the two cannot be said to be substantially similar in format. Moreover, Plaintiff's expert offered testimony confirming what the layperson could see.

---

[38] Fed. R. Civ. P. 56(c)(1)(A).
[39] Fed. R. Civ. P. 56(a).
[40] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
[41] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
[42] *See Anderson*, 477 U.S. at 255.
[43] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
[44] *Anderson*, 477 U.S. at 249-50.

## C. The Bank's font was smaller than the CFPB's minimum size

Plaintiff retained Thomas Phinney, a typography expert, who was able to explain and quantify the differences. As Phinney pointed out, and Defendant's expert conceded, (i) the font Defendant used for the general body of the disclosure was not Arial but rather an ITC Condensed Garamond font;[45] and (ii) the size of the letters in the condensed font Defendant used was as much as 12% smaller than the size of the corresponding letters in 10-point Arial.[46] The determination of Defendant's liability for using this font calls for a close analysis of the provisions of Regulation Z and the corresponding Official Staff Commentary governing credit card solicitations and applications.

Courts interpret regulations using the same well-established principles employed in the construction and analysis of statutes.[47] "Well-established principles of construction dictate that statutory analysis begins with the plain meaning of a law's text and, absent ambiguity, will generally end there."[48] Further, it is "a cardinal principle of statutory construction that statutes must be construed, if reasonably possible, so that no clause, sentence, or word shall be superfluous, void, or insignificant."[49]

---

[45] *See* Phinney Decl. at ¶ 25 & <u>Exhibits B and C</u>.

[46] *See* Phinney Decl at ¶s 37-43 & <u>Exhibits B and C</u>; Phinney Depo at 82-89.

[47] *See*, *e.g.*, *Schaar v. Lehigh Valley Health Servs.*, 598 F.3d 156, 160 (3d Cir. 2010).

[48] *Puello v. Bureau of Citizenship & Immigration Servs.*, 511 F.3d 324, 327 (2d Cir. 2007) (internal quotations and citations omitted).

[49] *Lotes Co., Ltd. v. Hon Hai Precision Industry Co., Ltd.*, 753 F.3d 395, 411 (2d Cir. 2014) (quotations and citations omitted.

Here, for the sake of readability on the part of consumers considering a new credit card, the CFPB staff promulgated a number of formatting provisions regarding the disclosures required by TILA subsection 1637(c), including one that the disclosures be printed in an Arial font at a 10-point or larger size.[50] In a summary provision immediately following, the CFPB specified that while it demanded information to be in a readable format, the only formatting provision that was actually mandatory under Regulation Z was the "10-point and 16-point font requirement."[51] The plain meaning of "font" as it applies to typography includes the style of typeface.[52] Significantly, the CFPB also adopted this meaning when it promulgated a regulation specifying the "Arial font" immediately adjacent to the summary provision. As such, the plain and unambiguous meaning of the regulation is to require issuers to print the disclosures in 10-point (or larger) Arial – or, at least, in a font not physically smaller than 10-point Arial. Further, a crabbed interpretation of "font requirement" in the summary provision as merely a size requirement and not a style-and-size requirement would render the CFPB's use of the word "Arial" in the adjacent provision insignificant or superfluous. This would violate "[a] basic tenet of statutory construction, equally applicable to regulatory

---

[50] The exception to this rule was for the annual percentage rate for purchases, which was to be disclosed in 16-point or larger.

[51] *See* 12 C.F.R. § 1026 Supp. I, Official Staff Commentary to Appendix G, Comments 5(vi).

[52] ROBERT BRINGHURST, THE ELEMENTS OF TYPOGRAPHIC STYLE 339 (4th ed. 2012) ("Font: A full set of glyphs, regarded purely as designs, or the physical embodiment of that set. In relation to metal, this means the set of sorts *sufficient for a given text or language* and *in a given size*, in the quantity needed to do the job. In relation to digital type, it means the glyph palette itself of the digital file encoding it.").

construction[:] that a text should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error."[53]

Even if Defendant could read an ambiguity into these Regulation Z provisions that might obviate the requirement of the Arial font – or its equivalent – in the solicitation disclosure under § 1637(c), the notion that the disclosures pass muster so long as they are nominally printed in "10-point" – an idea it presumably seeks to advance here – should be rejected. As Plaintiff's expert explained, "10-point" text could refer to a wide variety of actual text sizes, depending on the font.[54] And Defendant's own expert, during his deposition, agreed that the term "font size" does not make any sense in the abstract when not tied to any particular font.[55]

---

[53] *N.Y. State Rest. Ass'n v. N.Y. City Bd. Of Health*, 556 F.3d 114, 130-31 n.17 (2d Cir. 2009) (citation omitted).

[54] *See* Phinney Decl. at ¶ 19 & Exhibits B and C; Phinney Depo at 59, 94-96.

[55] In his deposition, Defendant's expert, Dr. Aries Arditi, had the following to say about the term "font size":

> Q.    Is it your opinion, based on the literature, that you could have lowered this [ITC Garamond] Light Condensed [reading sample] down to 8.7 before there would have been a drop off on reading speed and on mistakes?
> A.    Didn't you ask me that before?
> Q.    Now we are focusing on these, what's here.
> A.    You are saying you could lower it without – repeat it again.
> Q.    You could have reduced the font even smaller, down form this 10 point to 8.7?
> A.    That's consistent with the literature, yes.
> Q.    Did you try doing that?
> A.    No.

Nevertheless, as Defendant would have it, even text that measured a small fraction of the height and width of 10-point Arial text would be permissible in disclosures so long as the text was nominally "10-point." This flies in the face of "an elemental principle of statutory construction[:] that an ambiguous statute must be construed to avoid absurd results."[56] Clearly, the CFPB did not want to permit an issuer to be able to employ a font that is nominally 10-point but is actually a fraction the size of 10-point Arial.

    D. **The Bank's other formatting choices, taken together, degraded the readability of the disclosures below the CFPB's standards.**

Moreover, as explained above, the Bank did not just stop at swapping Arial for a smaller and less readable font. In furtherance of its not-so-subtle attempt to save paper and printing costs, the Bank made several other choices contrary to CFPB directives that further degraded the readability of the mandatory disclosures:

---

Q.    Did you try to figure out what the point was when it would no longer be readable to these people in the Starbucks?
A.    No.
Q.    Did you do that with the bottom one on Sample B, Exhibit 5, did you consider making it even smaller and seeing where the drop off would be?
A.    No.
*Q.    But, in theory, Capital One could have dropped down to 8.7 without influencing readability?*
*A.    My understanding is that there is a specified point size in the regulations, but I might be wrong.*
*Q.    Does that font size make any sense in the abstract not tied into any particular font?*
*MR. SCHAEFFER: Object to the form.*
*A.    No, it doesn't, actually.*

Arditi Depo at 162-64 (emphasis added).
[56] *Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 160 (2d Cir.2007).

> (1) it squeezed 28 lines of non-mandatory information on the same page with the mandatory disclosures;
>
> (2) it used a smaller paper format;
>
> (3) it removed white spaces between words and characters;
>
> (4) it removed white spaces between and around lines of text.

Taken together, these choices removed the Bank's disclosure from being "substantially similar" in format to the CFPB's disclosure model and samples.

### E. Violation of the Regulation amounts to violation of the statute

As detailed above, Congress vested the CFPB with the authority to promulgate regulations regarding the presentation of solicitation and application disclosures under TILA subsection 1637(c). Defendant's failure to comply with the regulatory requirements implementing subsection 1637(c) thus constitutes a violation of 1637(c). Ms. Strubel used her card after receiving the deficient disclosure, so the credit issuer's violation of subsection 1637(c) triggers civil liability, including statutory damages, attorney's fees and costs.[57]

## IV. Conclusion

The disclosure Capital One enclosed in its VentureOne credit card application is apt to make one squint or rub one's eyes in discomfort – and there is a reason for that. As Plaintiff's expert has pointed out, Capital One made several typographical choices no reasonable typesetter would have made, assuming the typesetter actually

---

[57] *See* 15 U.S.C. § 1640(a) (providing for statutory damages for any violation of 1637(c), so long as the consumer paid a fee or used the card).

cared about communicating the information in the disclosure. In short, Capital One completely disregarded the conventions of typography, completely disregarded its duty to ensure that the disclosure was readable, and completely disregarded the formatting guidance given by the CFPB.

There is no genuine issue of material fact here. Both parties agree that the outcome of this case depends on the legal question, "Did Capital One's disclosure comply with TILA and Regulation Z?" Because Plaintiff has demonstrated that Capital One's disclosure violates TILA and Regulation Z, she respectfully asks this Court to grant her motion for summary judgment.

Dated:  New York, New York
        May 18, 2015

                                              By:   /s/ Brian L. Bromberg
                                                    Brian L. Bromberg
                                                    One of Plaintiffs' Attorneys

_Attorneys for Plaintiffs_
Brian L. Bromberg
Jonathan R. Miller
Bromberg Law Office, P.C.
26 Broadway, 21st Floor
New York, New York 10004
Tel: (212) 248-7906

Harley J. Schnall
Law Office of Harley J. Schnall
711 West End Avenue
New York, NY  10025
Tel: (212) 678-6546

## Certificate of Service

I, Brian Bromberg, an attorney, hereby certify that on May 18, 2015, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Southern District's Local Rules, and/or the Southern District's Rules on Electronic Service upon the following parties and participants:

Jeffrey James Chapman jchapman@mcguirewoods.com

Harley Jay Schnall schnall_law@hotmail.com

Bryan A. Fratkin bfratkin@mcguirewoods.com

Jonathan Robert Miller jonathan@bromberglawoffice.com, jonathanmiller314@gmail.com

Seth A. Schaeffer sschaeffer@mcguirewoods.com

Dated:        May 18, 2015

/s/ Brian L. Bromberg
Brian L. Bromberg

Brian L. Bromberg
Bromberg Law Office, P.C.
26 Broadway
New York, NY 10004
Tel: (212) 248-7906