UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: MAR 2 9 2016
```

Abigail Strubel,

                          Plaintiff,

          —v—

Capital One Bank (USA), N.A.,

                          Defendant.

14-cv-5998 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

    Plaintiff Abigail Strubel brings this putative class action against Capital One Bank (USA), N.A. ("Capital One") for violating the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"). Strubel alleges that Capital One sent her a credit card solicitation accompanied by disclosures that failed to comply with TILA and with its implementing regulation, 12 C.F.R. Pt. 1026 ("Regulation Z"). Both parties moved for summary judgment. For the reasons set forth below, Strubel's motion is DENIED, and Capital One's motion is GRANTED.

## I.      Background

### A. Statutory and Regulatory Context

    Congress passed TILA in 1968 to ensure "a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a). To achieve these goals, TILA contains a variety of mandatory disclosures that creditors must make to consumers both prior to the establishment of any legal obligations, and at specified points in the creditor-consumer relationship. *Rossman v. Fleet Bank (R.I.) Nat'l Ass'n,* 280 F.3d 384, 389 (3d Cir. 2002). The Act grants rulemaking authority to the Consumer Financial Protection Bureau ("CFPB"). 15

1

U.S.C. § 1604(a). Prior to 2011, TILA's rulemaking authority was delegated to the Board of Governors of the Federal Reserve ("the Board"). *Strubel v. Comenity Bank*, No. 13-cv-4462, 2015 WL 321859, at *3 (S.D.N.Y. Jan. 23, 2015); 12 U.S.C. §§ 5581–82. Regulation under TILA "may contain such additional requirements . . . as in the judgment of the [CFPB] are necessary or proper to effectuate the purposes of [TILA], to prevent circumvention or evasion thereof, or to facilitate compliance therewith." 15 U.S.C. § 1604(a). All required disclosures under TILA must be made "clearly and conspicuously, in accordance with regulations of the [CFPB]." *Id.* § 1632(a).

The Fair Credit and Charge Card Disclosure Act of 1988, Pub. L. No. 100-583, 102 Stat. 2960, added a requirement that credit card issuers provide standardized information relating to interest rates and fees on credit card applications and solicitations. 15 U.S.C. § 1637(c). These disclosures must be made in a tabular format known as the "Schumer Box," after its chief proponent, Senator Charles Schumer. *Roberts v. Fleet Bank (R.I.)*, 342 F.3d 260, 263 n.1 (3d Cir. 2003). The Schumer Box disclosures must be "disclosed in the form and manner which the Board shall prescribe by regulations." 15 U.S.C. § 1632(c)(1)(A); *see also id.* § 1637(c)(1)(A). TILA contains a private right of action that provides statutory damages for violations of many disclosure obligations, including those related to the Schumer Box. *Id.* § 1640(a).

The Board's (now the CFPB's) Regulation Z implements TILA's disclosure requirements, including credit card solicitation disclosures. *See generally* 12 C.F.R. § 1026.60. It specifies the disclosures that must be placed in the Schumer Box's tabular format, as well as three disclosures that must be placed directly beneath the box. *Id.* The annual percentage rate, which must be disclosed in the Schumer Box, must be in at least 16-point type. *Id.* § 1026.60(b)(1). Regulation Z also requires that credit card disclosures be made "clearly and conspicuously." *Id.* § 1026.5(a)(1)(i). In an appendix, the CFPB provides a model form for Schumer Box disclosures (Form G-10(A)), as well as two sample forms (G-10(B) and G-10(C)) (collectively "model forms"). Regulation Z requires that the Schumer Box disclosures have

2

"headings, content, and format substantially similar" to the G-10 model forms in Appendix G. *Id.* § 1026.60(a)(2)(i).

The Board created (and the CFPB in relevant part adopted) Official Staff Commentary ("Commentary") elaborating on Regulation Z. The Commentary interprets the "clear and conspicuous" standard present in both TILA and Regulation Z. For most disclosures, the Commentary interprets "clear and conspicuous" to require that the information be presented "in a reasonably understandable form." 12 C.F.R. Pt. 1026, Supp. I cmt. ("Comment") 5(a)(1)-1; Comment 17(a)(1)-1. In the case of disclosures accompanying credit card solicitations, however, the Commentary interprets the standard as requiring something more stringent: that disclosures be both "in a reasonably understandable form" and "readily noticeable to the consumer." Comment 5(a)(1)-1. The "reasonably understandable form" standard "does not require that disclosures be segregated from other material or located in any particular place on the disclosure statement, or that numerical amounts or percentages be in any particular type size." Comment 5(a)(1)-2. However, the "readily noticeable" standard requires that disclosures "be given in a minimum of 10-point font." Comment 5(a)(1)-3.

The Commentary states that while use of model forms and clauses grants a safe harbor from liability, solicitation disclosures need not be identical to the model forms. Comment apps. G & H-1. However, the Commentary requires (paraphrasing Regulation Z) that any creditor choosing to eschew Form G-10(A) must provide disclosures "substantially similar in sequence and format" to the model forms. Comment app. G-5.ii. The Commentary notes that although the model forms are designed to be printed on an 8 ½ x 14 inch sheet of paper, "creditors are not required to use a certain paper size" in making these disclosures. Comment app. G-5.v. Finally, the Commentary details at some length the formatting techniques used by the CFPB to ensure that its model forms are "readable:"

> A. A readable font style and font size (10–point Arial font style, except for the purchase annual percentage rate which is shown in 16–point type).
> B. Sufficient spacing between lines of the text.

C. Adequate spacing between paragraphs when several pieces of information were included in the same row of the table, as appropriate. . . .

D. Standard spacing between words and characters.  In other words, the text was not compressed to appear smaller than 10–point type.

E. Sufficient white space around the text of the information in each row, by providing sufficient margins above, below and to the sides of the text.

F. Sufficient contrast between the text and the background.  Generally, black text was used on white paper.

*Id.*  The Commentary explains that while creditors are not required to follow the same formatting used in the creation of the model forms ("except for the 10–point and 16–point font requirement"), the CFPB "encourages issuers to consider these techniques when deciding how to disclose information in the table, to ensure that the information is presented in a readable format."  Comment app. G-5.vi.

### B. Factual and Procedural Background

Plaintiff Abigail Strubel received an application for a CapitalOne VentureOne card by mail in August 2013.  Def.'s Response to Pl.'s Rule 56.1 Statement ("Def.'s 56.1 Resp.") ¶ 1.  She applied for the card, was approved, and made a purchase with it.  Def.'s 56.1 Resp. ¶¶ 4–6.

The application Strubel received from Capital One included a one-page sheet of disclosures (the "Disclosures").  Pl.'s Response to Def.'s Rule 56.1 Statement ("Pl.'s 56.1 Resp.") ¶ 8; *see* Schaeffer Decl. Ex. A.  The Disclosures consisted of the Schumer Box, TILA-mandated disclosures required to sit beneath the Schumer Box, and twenty-eight lines of additional disclosures that Capital One chose to add below them.  Def.'s 56.1 Resp. ¶ 37; Pl.'s 56.1 Resp. ¶¶ 8–9; *see* Schaeffer Decl. Ex. A.  The Disclosures were printed in a font called ITC Garamond Light Condensed BT ("Garamond LC") in 10- and 16-point type.  Pl.'s 56.1 Resp. ¶¶ 10–11.  In formatting the Disclosures, Capital One used techniques called "leading" and "tracking" to reduce the whitespace between letters, words, and lines of text.  Pl.'s 56.1 Resp. ¶¶ 13–14.

On July 31, 2014, Strubel filed this putative class action alleging that the Disclosures violate TILA because they are not "clear and conspicuous," and do not comply with formatting

requirements imposed by Regulation Z. Dkt. No. 1. On November 24, 2015, the Court entered a case management plan bifurcating the issue of liability from the issues of damages and class certification. Dkt. No. 15. The parties filed cross-motions for summary judgment on the issue of liability, and the Court turns to them now.

## II.    Request for Stay

As an initial matter, Capital One asks the Court not to decide the motions currently pending before it in this case until the Supreme Court issues a decision in *Spokeo, Inc. v. Robins*, No. 13-1339. Def.'s S.J. Br. at 19–21. The Supreme Court granted certiorari in *Spokeo* to decide whether Congress can confer Article III standing on a plaintiff who has suffered no concrete harm by authorizing a private right of action based on a violation of a federal statute. The only injury Strubel mentions in her complaint is a violation of her statutory right to disclosure under TILA. Compl. ¶ 40. If the Supreme Court were to rule in *Spokeo* that statutory rights cannot confer Article III standing, this Court would likely determine that Strubel lacks standing to pursue her claim.

Although Capital One does not argue that Strubel lacks standing under current law, lack of standing is a defect in subject matter jurisdiction. *All. For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 85 (2d Cir. 2006). Federal courts must determine whether subject matter jurisdiction is present—*sua sponte* if necessary—and dismiss if it is lacking. *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008). There are three elements of Article III standing: injury in fact, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The Second Circuit has explained that Article III injury "may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing. The standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Kendall v. Emps. Ret. Plan of Avon Prods.*, 561 F.3d 112, 118 (2d Cir. 2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)) (internal quotation marks and brackets

omitted).  Here, TILA creates a statutory obligation of disclosure for creditors, and a private right of action through which consumers may enforce their entitlement to those mandatory disclosures.  Thus, it is no surprise that the Second Circuit has decided cases involving private suits to enforce TILA's disclosure provisions without questioning plaintiffs' standing.  *See Gambardella v. G. Fox & Co.*, 716 F.2d 104, 108 n.4 (2d Cir. 1983) ("It is well settled, however, that proof of actual deception or damages is unnecessary to a recovery of statutory damages under [TILA].").

The Supreme Court's grant of certiorari in *Spokeo* does not alter this analysis.  At this point, the Court has no way of telling whether or not the decision in *Spokeo* will benefit either party in this case.  And "a grant of certiorari does not effect new law, and has no precedential value." *United States v. Brooks*, No. 06-CR-550 (S-1)(JS), 2009 WL 3644122, at *12 (E.D.N.Y. Oct. 27, 2009) (citing *Ritter v. Thigpen*, 828 F.2d 662, 665–66 (11th Cir. 1987); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 94 n. 11 (1983)).  Capital One provides no argument or authority for why all litigation involving statutorily-created injuries should grind to a halt nation-wide pending the decision in *Spokeo* (or alternatively, for why this case in particular should be stayed).  Accordingly, the Court declines to stay this case and proceeds to the merits of the parties' arguments.  *See Speer v. Whole Food Mkt. Grp., Inc.*, No. 8:14-CV-3035-T-26TBM, 2015 WL 2061665, at *1 (M.D. Fla. Apr. 29, 2015) (declining to stay case until *Spokeo* is decided).

## III.    Summary Judgment

Strubel argues that the Disclosures fail to comply with TILA and Regulation Z for two reasons.  First, she argues that the Disclosures are not "clear and conspicuous" because they are not "readily noticeable."  Although the Disclosures are printed in 10-point type, Strubel argues that this is insufficient to meet the requirements imposed by Comment 5(a)(1) because Garamond LC is smaller than Arial, the font used in the model forms, at any given point size.  Second, Strubel argues that Capital One's formatting choices degraded the readability of the

Disclosures to the point that they are no longer "substantially similar" to the model forms in Appendix G as required by 12 C.F.R. § 1026.60(a)(2) and Comment app. G-5.ii.

The fact that Strubel's arguments focus on provisions of the Commentary, rather than the text of TILA or Regulation Z, has minimal effect on the Court's analysis. The Commentary is the CFPB's official interpretation of its own regulation, and it warrants deference from the courts unless "demonstrably irrational." *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 211 (2011). Capital One does not argue that that the portions of the Commentary at issue in this case are "demonstrably irrational," and the Court will treat the Commentary as a definitive interpretation of Regulation Z for the purposes of this opinion.

### A. Legal Standard

Federal Rule of Civil Procedure 56 "allows a party to seek a judgment before trial on the grounds that all facts relevant to a claim(s) or defense(s) are undisputed and that those facts entitle the party to the judgment sought." *Jackson v. Federal Express*, 766 F.3d 189, 194 (2d Cir. 2014). The Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In the absence of any dispute over the language or format of information disclosed to consumers, the question of whether "required disclosures have been made clearly and conspicuously" under TILA is a question of law to be resolved by the Court and not by a jury. *Gambardella v. G. Fox & Co.*, 716 F.2d 104, 113 (2d Cir. 1983). Conspicuousness is a question of law "not because judges are experts at graphic design, but because subjecting conspicuousness to fact-finding would introduce too much uncertainty into the drafting process." *In re Bassett*, 285 F.3d 882, 885 (9th Cir. 2002); *see also Smith v. Check-N-Go of Ill., Inc.*, 200 F.3d 511, 515

7

(7th Cir. 1999) (observing that if conspicuousness were a matter of fact, then lenders using identical forms could have inconsistent outcomes at trial). The same principle applies to the issue of whether a disclosure is substantially similar to a model form. *See, e.g., Karakus v. Wells Fargo Bank, N.A.*, 941 F. Supp. 2d 318, 327–33 (E.D.N.Y. 2013) (resolving substantial similarity question as a matter of law on motion to dismiss). The Court evaluates the adequacy of TILA disclosures "from the vantage point of a hypothetical average consumer—a consumer who is neither particularly sophisticated nor particularly dense." *Id.* at 330 (quoting *Palmer v. Champion Mortg.*, 465 F.3d 24, 28 (1st Cir. 2006)); *see also Schwartz v. Comenity Capital Bank*, No. 13 CIV. 4869 JGK, 2015 WL 410321, at *8 (S.D.N.Y. Feb. 2, 2015). Under Second Circuit law, TILA "does not require perfect disclosure, but only disclosure which clearly reveals to consumers the cost of credit." *Gambardella*, 716 F.2d at 118.

Both parties in this case agree that there are no disputed issues of material fact, and ask the Court to resolve Strubel's claims as a matter of law. *See* Capital One S.J. Opp. at 3; Strubel S.J. Br. at 18.

### B.  Whether the Disclosures Are "Clear and Conspicuous"

The first question before the Court is whether the Disclosures are "clear and conspicuous" within the meaning of TILA and Regulation Z. In the context of credit card solicitation disclosures, Comment 5(a)(1)-1 interprets the "clear and conspicuous" standard to require that disclosures be in a "in a reasonably understandable form" and "readily noticeable to the consumer." As applied to the visual appearance of text, the "reasonably understandable form" standard appears to require only that the text be legible. Comment 17(a)(1)-1; *see* Comment 5(a)(1)-2. The "readily noticeable" standard is not separately defined, but includes a requirement that credit card solicitation disclosures be printed in 10-point font. Comment 5(a)(1)-3.

### 1.  The Disclosures Are "Clear and Conspicuous" On Their Face

The Court has evaluated the Disclosures (attached to this opinion as Appendix A), and concludes that they are clear and conspicuous from the perspective of a "hypothetical average consumer." *Karakus*, 941 F. Supp. 2d at 330.  The text in the Disclosures is large enough and clear enough to be legible and readily noticeable.  And as required by the "readily noticeable" standard, it is set in 10-point type.  There is sufficient white space separating the letters, words, and lines of text so that they can be easily distinguished.  The text is printed in black ink on a white background (except for the headers, which reverse the coloring), creating adequate contrast for the reader.  The forms of the letters have standard shapes, and the font is not so stylized as to obscure the content of the text.  The Disclosures use bolding, underlining, and bullet points to pick out headings, and to emphasize where one disclosure ends and another begins.  The vast majority of required information in the Disclosures is presented in the Schumer Box, whose cells serve to separate, highlight, and identify each item.  Key numbers are bolded, and some are printed in significantly larger font than the surrounding text, making them draw the reader's eye.  Furthermore, the Disclosures are a far cry from those cases where courts have found text to be so difficult to read as to be not clear and conspicuous as a matter of law.  *See Cole v. U.S. Capital*, 389 F.3d 719, 731 (7th Cir. 2004) (text was not conspicuous as a matter of law where "its size approaches that which cannot be read with the naked eye"); *Lifanda v. Elmhurst Dodge, Inc.*, 237 F.3d 803, 808 (7th Cir. 2001) (text was not conspicuous as a matter of law because it was "so minuscule as to be barely legible").  In sum, the Court concludes from its examination of the Disclosures that they are "clear and conspicuous" to a hypothetical average consumer.

### 2.  The Text of the Disclosures is Sufficiently Large

Strubel argues that the Disclosures are not "clear and conspicuous" within the meaning of TILA or Regulation Z because they are not "readily noticeable" as required by Comment 5(a)(1)-1.  Specifically, she claims that the Disclosures are not "readily noticeable" because they do not comply with the Commentary's minimum font size requirement.  It is undisputed that the

9

Disclosures are printed in 10-point type (except where required to be in 16-point type), as required by the Commentary. Pl.'s 56.1 Resp. ¶ 11. However, it is also undisputed that the Disclosures were printed in a font, Garamond LC, that is smaller than Arial, the font used in the model forms, at any given point size. *See id.* ¶¶ 11–12.

This is so because although font size is measured in points, a font's point size does not actually correspond to the size of the printed characters. Phinney Report at 13–15. In fact, the relationship between a font's point measurement and the size of its printed characters is arbitrary. *Id.* The only restriction is that the ratio of point size to letter size must remain constant. *See id.* Thus, a font printed in 11-point type will be always be 10% larger than the same font printed in 10-point type—but the size of the printed letters at 11 points can be whatever the designer wishes. *See id.*

For instance, this sentence is written in Times New Roman in 12-point type. This sentence is written in Arial in 12-point type. This sentence is written in 12-point type in Monotype Garamond, a member of the Garamond family of fonts that also includes Garamond LC. This sentence is written in Angsana New in 12-point type.

Strubel's claim is that while the Disclosures were nominally in 10-point type, the font size requirement cannot be met by simply setting any font in 10-point type, because that would be too easily evaded. It would be simple to obtain or create a font whose printed characters are extremely small when set to 10 points. Instead, she argues that Comment app. G-5 should be read to require that disclosures be printed either in Arial (the typeface used in the model forms), or in a typeface whose characters are no smaller than those of 10-point Arial. Strubel S.J. Br. at 14.

### a. Interpreting the Font Size Requirement

The Court finds Strubel's reading of the Commentary's font size requirement to require Arial or a font no smaller than Arial to be unpersuasive. Strubel bases her argument on Comment app. G-5.v's list of techniques used by the CFPB to ensure that the model forms are

"readable." Comment app. G-5.v.A states that the model forms employ "[a] readable font style and font size (10-point Arial font style, except for the purchase annual percentage rate which is shown in 16-point type)." From this language, Strubel draws the conclusion that when the Commentary speaks of 10-point font, the CFPB is envisioning 10-point Arial, or at least text the same size as 10-point Arial. Strubel S.J. Br. at 13–15. However, at the bottom of the list of formatting techniques, the Commentary explains that "the [CFPB] is not requiring issuers to use the above formatting techniques in presenting information in the table (except for the 10–point and 16–point font requirement)." Comment app. G-5.vi. The portion of the Commentary on which Strubel relies differentiates font style from font size, and the lines quoted in the previous sentence make clear that only the latter is required.

Agencies that seek to impose font style restrictions are quite capable of doing so. Numerous examples are available in the Code of Federal Regulations. Some disclosure regulations specify font and point size, *see, e.g.*, 16 C.F.R. § 1615.1(o)(10)(ii) (warning text "must be 11 point Arial/Helvetica"), others require fonts "equivalent" to the sample font, *see, e.g.*, 16 C.F.R. § 305.11(b) ("The Arial series typeface or equivalent shall be used exclusively on the label."), while the most detailed offer specifications for the size of printed letters, *see, e.g.*, 37 C.F.R. § 1.58(c) (font "must be chosen from a block (nonscript) type font or lettering style having capital letters which should be at least 0.422 cm. (0.166 inch) high (e.g., preferably Arial, Times Roman, or Courier with a font size of 12), but may be no smaller than 0.21 cm. (0.08 inch) high (e.g., a font size of 6)"). The Commentary includes no such language in any of its variations.

Strubel's argument that the 10-point font size requirement cannot accommodate any variation in printed character size due to font style is further undermined by evidence from the Federal Register. In formulating the relevant portion of the Commentary, the Board selected a 10-point font size to be consistent with a standard developed by an interagency process (in which the Board participated) to design model privacy disclosure forms required under the Gramm-Leach-Bliley Act, 15 U.S.C. § 6803(e)(2)(D). Truth in Lending, 74 Fed. Reg. 5244, 5269 (Jan.

29, 2009).  The interagency proposal referenced by the Board explicitly acknowledged that the

size of printed letters at a given point size varies by font style.  It stated that

> The readability of type size is highly dependent on the selection of the type style.  Some
> styles in 10-point font are more readable than others in 12-point font and appear larger
> because of their design.  Accordingly, the Agencies are proposing 10-point type size as
> the minimum size for use on the model form.

Interagency Proposal for Model Privacy Form Under the Gramm-Leach-Bliley Act (the

"Interagency Proposal"), 72 Fed. Reg. 14940, 14954 (Mar. 29, 2007).  The Interagency Proposal

explains that the font size requirement is not accompanied by a requirement to use "a particular

type style or x-height."  *Id.*  "X-height" refers to a font's lowercase letter body height, measured

as the height of a lowercase x.  *Id.* at 14954 n.40.  The Interagency Proposal offers guidance

suggesting that fonts with smaller x-heights be printed in larger than 10-point font, but this is

explicitly *guidance* rather than a requirement.  *See id.* at 14954.

      The Court's rejection of Strubel's interpretation does not give creditors *carte blanche* to

vitiate the font size requirement through the use of fonts that produce tiny printed characters

when set in 10-point type.  The Commentary's requirement that a "readily noticeable" disclosure

be in 10-point type implies a lower bound for printed character size, because regulating the size

of text is the only conceivable purpose behind setting a font size requirement.  The Board

employed a font size requirement based on its determination that a set font size was "needed to

highlight for consumers the importance and significance of the disclosures."  74 Fed. Reg. at

5269.  The Commentary treats font size as the most important element of textual formatting in

the adequacy of disclosures.  The 10-point font size was the only specific requirement that the

Board added to the "readily noticeable" standard.  *See* Comment 5(a)(1)-3.  In Comment app. G-

5, the Board detailed a laundry list of formatting choices used to enhance readability, but only

font size is mandatory.  A font size requirement for the annual percentage rate and other critical

numbers in credit card solicitations is specifically mandated by Regulation Z.  *See* 12 C.F.R

§ 1026.60(b)(1).  Given the emphasis on font size as a means of ensuring that disclosures are

brought to consumers' notice, the Court will not read the "readily noticeable" standard to permit

text of any printed size so long as it is nominally set in 10-point type. The "readily noticeable"

standard must be interpreted in light of the 10-point font requirement so as to require printed text

that is not unreasonably small. However, as explained below, to reflect the diversity of

permissible fonts, "unreasonably small" must be evaluated with reference to the range of sizes of

standard or commonly-used fonts set in 10-point type.

### b. Applying the Font Size Requirement

Application of the preceding analysis is consistent with the Court's determination that the

text in the Disclosures is "readily noticeable." The Disclosures are set in 10-point type, as

required by the Commentary. *See* Comment 5(a)(1)-3. Although the text of the Disclosures,

printed in Garamond LC, is physically smaller than the Arial text of the model forms, the Court

cannot say that the Disclosures' text is unreasonably small compared to Arial, or to other

commonly-used fonts set in 10-point type. Nor, as noted above, is the text so small that it

would not be readily noticeable to a hypothetical average consumer. Strubel does not claim

otherwise. Strubel argues that Garamond LC is a smaller font than Arial, but nowhere suggests

that Garamond LC is unreasonably small, or outside the range of size variation among

commonly-used fonts. Neither does she provide any case law, under TILA or under any statute

or regulation, state or federal, in which a font of similar dimensions to Garamond LC was held to

be too small when set at a required point size.

In fact, there is reason to believe that Garamond LC is within the range contemplated by

the Commentary. The Interagency Proposal, on which the Commentary based its font size

requirement, offers a list of a number of fonts that meet its guidelines. Included on this list is

Garamond, the font family of which Garamond LC is a member. 72 Fed. Reg. at 14954.

Although Strubel's expert discusses the relationship between Garamond LC and other Garamond

fonts, neither he nor Strubel suggest that Garamond LC has shorter letters than its relatives. *See*

Phinney Report at 3–4. Because the Board's font size requirement was created to match the

Interagency Proposal, 74 Fed. Reg. at 5269, it too encompasses the use of Garamond fonts like Garamond LC.

Strubel's own authority strengthens this conclusion.  Strubel cites to New York's law governing point size requirements, N.Y. C.P.L.R. § 105(t), to support her claim that the Commentary incorporates stringent requirements for printed character size.  Strubel S.J. Opp. at 20.  New York state law requires that to meet a point size requirement, the x-height of the printed characters must be at least 45% of the point size.  N.Y. C.P.L.R. § 105(t).  However, Garamond LC meets the size requirements of New York law.  *See* Phinney Report at 6 (x-height of Garamond LC is 45.41% of point size).  And Strubel points the Court to no other rule governing point size (other than those requiring specific fonts, a restriction not present in the "readily noticeable" standard) that would exclude Garamond LC.

### C. Whether the Disclosures are "Substantially Similar" to the Model Forms

Next, the Court considers whether Capital One's formatting choices caused the Disclosures to violate TILA's command that the Schumer Box information be "disclosed in the form and manner which the Board shall prescribe by regulations."  15 U.S.C. § 1632(c)(1)(A); *see also id.* § 1637(c)(1)(A).  Specifically, Strubel claims that the Disclosures do not meet Regulation Z's requirement that Schumer Box disclosures be presented in "the form of a table with headings, content, and format substantially similar" to the G-10 model forms in Appendix G, 12 C.F.R. § 1026.60(a)(2)(i), or the Commentary's similar requirement that such disclosures "must be substantially similar in sequence and format" to the G-10 model forms, Comment app. G-5.ii.  The Court evaluates the issue of substantial similarity from the perspective of a "hypothetical average consumer."  *Karakus*, 941 F. Supp. 2d at 330.

Strubel argues that the Disclosures are not substantially similar to the model forms because they are not "readable."  *See* Strubel S.J. Br. at 16–17.  Capital One also agrees that the Disclosures must be "readable" to comply with TILA.  Capital One Opp. at 11.  The word "readable" comes from language in Comment app. G-5.vi following a list of optional formatting

14

techniques including the whitespace guidance described above.  Comment app. G-5.vi states that "the [CFPB] encourages issuers to consider these techniques when deciding how to disclose information in the table, to ensure that the information is presented in a readable format."  The parties interpret this to mean that the Disclosures must be "readable" in order to be substantially similar to the model forms.

The Court has compared the formatting of the Disclosures to that of the model forms, and finds them to be readable and substantially similar from the perspective of a hypothetical average consumer.  The sequence and format of the tables in the Disclosures are substantially similar to those in model form G-10(A), and in particular almost identical to those in sample form G-10(B) (attached to this opinion as Appendix B).  The Disclosures and sample form G-10(B) each contain two tables with headers that have white text on black backgrounds, and that have bolded text in the left column of the table.  Their cells are similar in number and order, use bullet points and bolding for emphasis (in the right column) similarly, and divide text between cells similarly. There are similar levels of contrast between the background and the text.  And as in the model form, key numbers are both bolded and set forth in a significantly larger font size than the surrounding text.

Strubel points to three formatting choices made by Capital One that she claims make the Disclosures not substantially similar to the model forms.  However, each of the formatting choices she identifies was specifically made optional by the CFPB.  Her first complaint is that Capital One added 28 lines of non-mandatory information beneath the mandatory disclosures that were not included on the model forms.  But Regulation Z specifically provides that "[o]ther information may be presented on or with an application or solicitation, provided such information appears outside the required [Schumer Box] table"—as it does in the Disclosures. 12 C.F.R. § 1026.60(a)(2)(ii).  Second, Strubel notes that the Disclosures are printed using a smaller paper format than the model forms.  However, the Commentary states that "creditors are not required to use a certain paper size" in making credit card solicitation disclosures, and that "[a] creditor may use a smaller sheet of paper."  Comment app. G-5.v.  Third, Strubel objects to

15

the fact that Capital One removed whitespace between words and characters in the Disclosures, and between and around lines of text, making the Disclosures seem visually cramped in comparison to the model forms.  Although the Commentary explains that the CFPB designed the model forms to include "[s]ufficient spacing between lines of the text," "standard spacing between words and characters," and "[s]ufficient white space around the text of the information in each row," it specifically indicates that these are not required.  *Id.*  The Commentary states that "the [CFPB] is not requiring issuers to use the above formatting techniques in presenting information in the table (except for the [font size requirements])."  Comment app. G-5.vi.  Instead, the CFPB merely "encourages issuers to consider these techniques when deciding how to disclose information in the table, to ensure that the information is presented in a readable format."  *Id.*

In conducting its substantial similarity analysis, the Court considered that the text has less space between characters, words and lines, is printed on smaller paper, and has some additional disclosures beneath the tables.  However, because the CFPB explicitly permits creditors to deviate from these formatting elements, the Court gave them little weight.  Although the smaller paper size and additional voluntary disclosures mean that the Schumer Box in the Disclosures is smaller than that of the model forms, it is not so small as to reduce the Disclosures' effectiveness or to prevent them from being in a substantially similar format.  Similarly, although the text of the Disclosures has less whitespace than the text of the model forms, there is sufficient whitespace for the text to be clear and conspicuous, as discussed above.  Furthermore, the text most affected by the reduction in whitespace is that placed below the tables.  But the vast majority of that text consists of additional voluntary disclosures, rather than the mandatory disclosures whose formatting is governed by Regulation Z and the Commentary.  The reduction in whitespace is not so great as to impede substantial similarity or overall readability.  Taken as a whole, then, the Court concludes that the formatting of the tables in the Disclosures is readable and substantially similar to the formatting of the tables in the model forms, and would appear so to a hypothetical average consumer.

IV.    **Conclusion**

For the reasons set forth above, Strubel's motion for summary judgment on liability is denied, and Capital One's motion is granted.  This resolves Dkt. Nos. 27 and 31.  The Clerk of Court is instructed to close the case.


SO ORDERED.

Dated: March  29, 2016
       New York, New York

ALISON J. NATHAN
United States District Judge

# APPENDIX A

CAPITAL ONE® IMPORTANT DISCLOSURES

Card Center, P.O. Box 30284, Salt Lake City, UT 84130-9842

| Interest Rates and Interest Charges | |
|---|---|
| **Annual Percentage Rate (APR) for Purchases** | **0%** introductory APR through your 08/2014 billing period.<br><br>After that, your APR will be **11.9%**, **15.9%** or **19.9%**, based on your creditworthiness.<br>This APR will vary with the market based on the Prime Rate. |
| **APR for Transfers** | **11.9%**, **15.9%** or **19.9%**, based on your creditworthiness.<br>This APR will vary with the market based on the Prime Rate. |
| **APR for Cash Advances** | **24.9%**.<br>This APR will vary with the market based on the Prime Rate. |
| **Penalty APR and When It Applies** | **29.4%**.<br>This APR will vary with the market based on the Prime Rate.<br>This APR may be applied to your account if you make a late payment.<br>**How Long Will the Penalty APR Apply?:** If APRs are increased for a payment that is late, the Penalty APR may apply indefinitely. |
| **Paying Interest** | Your due date is at least 25 days after the close of each billing cycle. We will not charge you interest on new purchases, provided you have paid your previous balance in full by the due date each month. We will begin charging interest on cash advances and transfers on the transaction date. |
| **Minimum Interest Charge** | If you are charged interest, the charge will be no less than $0.50. |
| **For Credit Card Tips from the Consumer Financial Protection Bureau** | To learn more about factors to consider when applying for or using a credit card, visit the website of the Consumer Financial Protection Bureau at **http://www.consumerfinance.gov/learnmore**. |

| Fees | |
|---|---|
| **Annual Fee** | None. |
| **Transaction Fees**<br>• Transfer<br>• Cash Advance | None.<br>Either **$10** or **3%** of the amount of each cash advance, whichever is greater. |
| **Penalty Fees**<br>• Late Payment<br>• Over-The-Credit-Limit<br>• Returned Payment | Up to **$35**.<br>**None.**<br>**None.** |

999D999

**How Do You Calculate My Balance?** We use a method called "average daily balance (including new purchases)." See enclosed Additional Disclosures for details.
**Can I Lose My Introductory APR?** We may end your introductory APR and apply the Penalty APR if you make a late payment.
**What Are My Billing Rights?** Information on your rights to dispute transactions and how to exercise those rights is provided in the enclosed Additional Disclosures.
**Am I Eligible For This Offer?** Please refer to the enclosed Additional Disclosures & Terms and Conditions.
**What Should I Put For Total Annual Income?** Enter your **personal** annual income from all sources (e.g., full-time, part-time or seasonal jobs, self employment, interest or dividends, retirement and public assistance). Annual income is one of the factors used to assess your ability to make monthly payments on this account. It must be enough to cover these payments, plus estimated living expenses and any other debt you are responsible for.
**What Will My APR Be If I Transfer A Balance?** Any balances that you transfer on or before September 1, 2014, will receive your Transfer APR. They will be posted to the Special Transfer segment of your account. Any balances that you transfer after that date will receive your Purchase APR and will be posted to the Purchase segment of your account unless the transfer is made in connection with a future offer from us.
**Can You Change My Account Terms?** We can change the terms of your account as permitted by law. When required, we will send you notice before doing so.
**If My Rate Is Increased To The Penalty Rate, Will It Ever Be Reviewed For A Possible Decrease?** Yes. Capital One will periodically review any rate increase to your account for a possible rate decrease.
**How Do You Calculate My Variable Rates?** Your variable rates may change when the Prime rate changes. We calculate variable rates by adding a percentage to the Prime rate published in *The Wall Street Journal* on the 25th day of each month. If the *Journal* is not published on that day, then see the immediately preceding edition. Variable rates on the following segment(s) will be updated monthly and will take effect on your next billing period: Non-Introductory Purchase APR: Prime plus 8.65%, 12.65% or 16.65%;Transfer APR: Prime plus 8.65%, 12.65% or 16.65%; Cash Advance APR: Prime plus 21.65%; Penalty APR: Prime plus 26.15%.
**How Do You Determine My Credit Line?** We determine your credit line based on your credit history and information you provide on your application. The minimum credit line is $3,000.
**How Do You Determine Whether I Will Receive The Visa Signature Or Visa Platinum Card?** Your credit history and application will be reviewed to determine your credit line. If you are approved for a credit line less than $5,000, you will receive a Visa Platinum card. Some terms and benefits are not available with the Visa Platinum card. See our Complete Guide to Credit Card Benefits for Visa Platinum card benefit information.
**What Are The Daily Periodic Rates Used To Calculate My Interest?** The daily periodic rate for your Introductory Purchase APR is 0.00000%, Non-Introductory Purchase APR is 0.03260%, 0.04356% or 0.05452%, Transfer APR is 0.03260%, 0.04356% or 0.05452%, Cash Advance APR is 0.06822%, and Penalty APR is 0.08055%. See *How Do You Calculate the Interest Charge?* in the enclosed Additional Disclosures for more details.
**How Do You Calculate My Minimum Payment?** If your balance is less than $25, your minimum payment will equal your balance. Otherwise, your minimum payment will be the greater of $25 or 1% of your balance plus interest (periodic interest charges) and late payment fees. If your Account is 180 days past due, part of a bankruptcy proceeding or otherwise charges off, the entire balance is due immediately.
Visa is a registered trademark of Visa International Service Association.

**Refer to the "Additional Disclosures & Terms and Conditions" enclosed for additional important disclosures and rewards information.**

# APPENDIX B

## G-10(B) Applications and Solicitations Sample (Credit Cards)

| Interest Rates and Interest Charges | |
|---|---|
| **Annual Percentage Rate (APR) for Purchases** | **8.99%** to **19.99%** when you open your account, based on your creditworthiness.<br><br>After that, your APR will vary with the market based on the Prime Rate. |
| **APR for Balance Transfers** | **15.99%**<br><br>This APR will vary with the market based on the Prime Rate. |
| **APR for Cash Advances** | **21.99%**<br><br>This APR will vary with the market based on the Prime Rate. |
| **Penalty APR and When it Applies** | **28.99%**<br><br>This APR may be applied to your account if you:<br>1) Make a late payment;<br>2) Go over your credit limit twice in a six-month period;<br>3) Make a payment that is returned; or<br>4) Do any of the above on another account that you have with us.<br><br>**How Long Will the Penalty APR Apply?:** If your APRs are increased for any of these reasons, the Penalty APR will apply until you make six consecutive minimum payments when due. |
| **How to Avoid Paying Interest on Purchases** | Your due date is at least 25 days after the close of each billing cycle. We will not charge you any interest on purchases if you pay your entire balance by the due date each month. |
| **Minimum Interest Charge** | If you are charged interest, the charge will be no less than $1.50. |
| **For Credit Card Tips from the Consumer Financial Protection Bureau** | **To learn more about factors to consider when applying for or using a credit card, visit the website of the Consumer Financial Protection Bureau at http://www.consumerfinance.gov/learnmore** |

| Fees | |
|---|---|
| **Annual Fee** | **None** |
| **Transaction Fees** | |
| • Balance Transfer | Either **$5** or **3%** of the amount of each transfer, whichever is greater (maximum fee: **$100**). |
| • Cash Advance | Either **$5** or **3%** of the amount of each cash advance, whichever is greater. |
| • Foreign Transaction | **2%** of each transaction in U.S. dollars. |
| **Penalty Fees** | |
| • Late Payment | Up to **$35**. |
| • Over-the-Credit Limit | Up to **$35**. |
| • Returned Payment | Up to **$35**. |
| **Other Fees** | |
| • Required Account | **$0.79** per **$100** of balance at the end of each statement period. See back for details. |

| Protector Plan | |
|---|---|

**How We Will Calculate Your Balance:** We use a method called "average daily balance (including new purchases)."